UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| T.M., by and through TARENA TURNER,<br>as next friend, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:11 CV 766 CDP |
| | ) | |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying plaintiff T.M.'s application for child's

supplemental security income.  Plaintiff's  mother, Tarena Turner, brings this

action on behalf of her son, claiming that he is disabled because of ADHD,

conduct disorder, and expressive and receptive language disorder.  The

Administrative Law Judge concluded that T.M. was not disabled.  I find that the

ALJ's determination that T.M. did not have a marked limitation in the functional

domain of Attending and Completing Tasks was not supported by substantial

evidence.  However, because I find that the overall decision denying benefits was

supported by substantial evidence, I will affirm.

## *Procedural History*

On June 12, 2008, Turner applied for child's supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.*, on her son's behalf.  The Social Security Administration denied the claims, and T.M. filed a timely hearing request.  T.M., Turner, and T.M.'s father, Timothy McCowan, appeared and testified at a hearing held on November 18, 2009.  The Administrative Law Judge issued an opinion on January 8, 2010, upholding the denial of benefits.  T.M. requested review by the Appeals Council for the Social Security Administration, and on April 13, 2011, the Council denied T.M.'s request.  The ALJ's determination thus stands as the final determination of the Commissioner.

## *Testimony of Claimant and His Family*

At the hearing before the ALJ, T.M. testified that he was in second grade, that he got in trouble at school every day, and that he had recently hit people on the bus for "messing with" him.  He testified that he sometimes got under his desk at school and his teacher had to get him out.  He stated that his favorite food was broccoli and that his favorite subject was math.  When the ALJ asked T.M. what he wanted to be when he grew up, T.M. said, "I want to be a police."  When the ALJ asked T.M. for his full name, T.M. gave his middle name last.

– 2 –

T.M.'s mother, Tarena Turner, alleged a disability onset date for T.M. of February 1, 2005, just before T.M. turned three years old.  She testified that T.M. had significant problems in almost all the areas on his 2007–08 kindergarten report card and that the assessment from school was consistent with T.M.'s home behavior.  Those areas included character development, practical skills, reading and writing skills, comprehension skills, listening, speaking, math, science and social studies.

Turner has noticed T.M. skips words when he speaks, and "it doesn't come out like you or I or even other children his age would say things."  T.M. was diagnosed with severe receptive and expressive language disorder in September 2008.  He had been referred to a speech therapist employed with the school district, but Turner preferred he go to a speech pathologist at Children's Hospital because the pathologist was "more available" and the school therapist's schedule was "sporadic."  Turner testified that T.M.'s pediatrician referred him to the pathologist shortly before the hearing,[1] and he had not yet seen the pathologist because of difficulties with transportation, insurance, and receiving the referral. The ALJ pointed out that the language disorder diagnosis was given in September

---

[1] Medical records from T.M.'s treating pediatrician, Dr. Alison Nash of St. Louis Pediatric Practitioners, Inc., dated June 12, 2008, shows a referral to the "consultant of patient's choice" for T.M.'s speech problems.

2008 and  asked Turner why the pediatrician had not referred T.M. to the

pathologist before November 2009.  Turner testified that the school district had

given her "the runaround" because, at first, it had  found that T.M. had not tested

low enough to receive a referral.

Turner had been called multiple times by T.M.'s school about his behavior

and his failure to complete his work.  She testified that she had participated in

"classroom intervention" for T.M. throughout first grade, in which T.M. was

rewarded for having good days.  During his second grade year, Turner would "pop

up" to school to check on her son.  She testified that she saw him running down

the hall when he was supposed to be lined up with his classmates and that his

second grade teacher "has to fight, really hold him, like right next to him when

they walk down a hall."  She had attended parent-teacher conferences after the

first quarter of second grade and had seen that some of T.M.'s schoolwork was

incomplete.  Turner testified that even before the medication had stopped working,

she received calls from school that he was not completing his routine morning

schoolwork.  T.M.'s behavior started to worsen after the middle of October 2009,

and he received three consecutive days of write-ups from the school.   T.M. was

not in special education classes, but his school had issued paperwork to his

teachers for the purpose of creating an Individualized Education Plan about a

week before the hearing.  He had been in an after-school tutoring program for almost one month, but he was removed from the program the day before the hearing because "nobody can control him."  Turner did not think the tutoring had helped T.M. and she believed that was because he had not "had the ability to actually sit down" and be tutored.  He had also recently been suspended from the bus for ten days and Turner was taking him to school.

Turner testified that T.M. had initially been prescribed medication because of his behavior in kindergarten.  During the first month of kindergarten, T.M. went behind the teacher's desk and urinated on the floor.  Since then, T.M. had been taking Adderall for his behavior and ADHD, but his pediatrician switched his prescription to Vyvanse shortly before the hearing.  Turner had requested the switch because, although the pediatrician had gradually increased T.M.'s dosage of Adderall, it had become less effective during the previous two months.  T.M. became "more physical" with other children, had more behavior issues in the classroom, and had a hard time following directions at home.  Turner also testified, however, that T.M. had an appointment with the pediatrician later that day "to see what we can do about it because [she didn't] think Vyvanse was for him."  Turner had taken T.M. off of his medication the weekend prior to the hearing, but it is not clear from her testimony which medication he was on at that

– 5 –

point.  Even while T.M. was taking Adderall and his behavior was "more under control," T.M. hit his younger siblings three or four times per week.  Since the medication had stopped working, his behavior at home had worsened.  T.M. has problems completing chores like putting away his clothes.

Turner testified that T.M. does not have any friends he sees outside of school. He has seen a therapist at Grace Hill Clinic three times prior to the hearing to help him handle anger.  Turner allowed T.M. to attend summer school in 2009 because it was taught by his first grade teacher, with whom he was comfortable. Turner did not sign T.M. up for any camps because "sometimes people can't really deal with him because he's just so bouncy and off the wall, so it's kind of hard to manage him with 30 other kids."  T.M. did not have "too many issues" with summer school.

Turner testified that before his medication stopped working, T.M. could feed himself, bathe himself, and make peanut butter and jelly sandwiches, but that he could not take phone messages that required him to do something after he hung up.  She testified that he was interested in joining the Boy Scouts but that she did not want to allow him to join until "I get this medication thing under control because it was once under control, and now I'm pretty much at a wall now because I don't know what else could we try."

T.M.'s father, Timothy McCowan, testified that he had recently moved back into the family home with T.M.  Before that, T.M. would visit McCowan on weekends.  McCowan agreed with Turner's testimony.  He testified that he helped out with a football team, and T.M. participated for three or four practices.  They had to discontinue because McCowan's work schedule changed.  T.M. had problems listening during those practices.  If T.M. went with another coach, the coach would have to tell T.M. to "stay in line" three or four times before he would listen.  McCowan testified that when T.M. visited on weekends, he would sometimes hit his older sister, who was living with McCowan, but he was able to complete simple chores like picking up after himself.

### *Function Reports*

In a function report for children 3 to 6 years old, dated November 21, 2007, T.M.'s mother stated that T.M.'s speech could be understood "most of the time" by people who knew him well and "some of the time" by others.  T.M. did not use complete sentences of more than four words most of the time, did not tell about things that happened in the past, could not deliver simple messages and could not answer questions about a short read-aloud children's story.  He could talk about what he was doing, take part in conversation with other children, ask for what he wanted, and tell a made-up or familiar short story.  He knew his age, and he could

recite numbers up to ten, count objects, identify most colors and shapes, and read

capital letters.  He did not ask what words mean and could not define common

words.  He did not understand jokes.  Turner stated that T.M.'s physical abilities

were not limited and that his impairments did not affect his ability to take care of

his personal needs, like eating, dressing, bathing, and using the bathroom.  T.M.

did not take turns or play board games.  He had a temper, but he showed affection

toward other children and his parents, enjoyed being with other children, played

games like tag and hide-and-seek, and could share toys.  His attention span was

limited to 30 minutes.

In a second, undated function report for children 6 to 12 years old, Turner

lists similar speech and behavior issues.[2]  T.M.'s speech could be understood

"some of the time" both by people who knew him well and those who did not

know him well.  T.M. could talk with family and use sentences with "because,"

"what if," or "should have been," but he could not deliver telephone messages,

repeat stories he had heard, tell jokes or riddles accurately, or explain why he had

done something.  T.M. could read the letters of the alphabet and simple words, and

he could print his name and some letters.  He could also spell most 3- or 4-letter

---

[2]  Although the function report is undated, the Court Transcript Index states that it was
completed June 23, 2008, about seventeen months before the hearing.

words, and he knew the days of the week and the months of the year.  But T.M. could not read simple sentences, write a simple story, add or subtract numbers over 10, or tell time.  He had friends his own age and generally got along with teachers and adults, but he could not make new friends, wash his hair, choose his clothes, do what he was told, or obey safety rules.  He could use zippers, buttons, and shoelaces, eat by himself using silverware, and put away his toys, and he could help around the house, though he did not usually complete his chores.  He could keep busy on his own, complete his homework, and work on arts and crafts projects, but he could not finish things he started nor accept criticism or correction.

### *School Evidence*

T.M.'s first-quarter kindergarten progress report lists many areas of concern, including accepting the teacher's authority, respecting people and things, playing and sharing cooperatively, appropriately controlling actions and feelings, following directions, working in small groups, and refraining from disturbing others.  T.M. did not know his address, phone number, or numbers higher than 10, and could not use top-to-bottom or left-to-right reading progressions, or sound out, match, or recognize simple words.  He also could not listen to, recall, or retell a story.   The only areas in which T.M. received an "M" for "meeting expectations"

were naming colors, reciting his birthday, stating the names of letters, and identifying shapes.  A handwritten report from his kindergarten teacher states that, in one week, T.M. picked up chairs and threatened to throw them, threw pencils, books, paper and crayons, pushed other children, stabbed a classmate with a pencil, took things from the teacher's desk, crawled under desks, tore books with his teeth, and tried to climb a second-floor bannister.  Turner testified during the hearing that T.M. was still engaging in similar behavior.

Turner requested an initial evaluation for an Individualized Education Plan for T.M. at the beginning of his first-grade year, on August 18, 2008, but the counselor and the school psychologist from T.M.'s school district denied her request.  On November 17, 2009, T.M.'s second-grade teacher, Jerome Jernigans, recorded several behavioral incidents from October and November 2009 in which he reported that T.M. threw things, kicked and punched other students, tore up another student's workbook, choked his brother, threatened to bring a knife to school, and wrote inappropriate words.  The data report was submitted to the ALJ.

T.M.'s second-grade report card was also submitted to the ALJ.  One quarter was completed at the time of the hearing.  T.M. received an "S" for "satisfactory effort" in language, reading, math, science, social studies, and physical education.  He received a "P" for "progressing," a level lower than "S," in

– 10 –

art and music.  In those subjects, he did not consistently participate appropriately.

T.M. earned a "3" on his progress for each of eight subjects, which meant that he "usually" demonstrated expected performance and that he needed minimal assistance in applying his skills and had few inconsistencies in his work.  He read below grade level, could not consistently write in narrative and expository forms, and could not consistently spell grade-level words correctly.  However, he could consistently speak clearly and stay on topic, develop his vocabulary, organize ideas into complete sentences, use capitalization and punctuation, read independently for pleasure, and comprehend written text at grade level.  T.M. did not consistently show respect, practice self-control, work cooperatively with others, use time wisely, assume responsibility for his actions, or contribute positively to class discussions.  He consistently followed directions, used listening skills, kept his materials organized, and completed his homework.  His second-grade teacher, Jerome Jernigans, wrote that T.M. "sometimes disrupts the learning process.  He distracts others by running around and playing with toys or objects such as manipulatives.  He tried hard and when not being a disruption he is cooperative and pleasant.  Very interested in learning and enjoys learning."

In an evaluation dated November 25, 2009, and submitted to the ALJ after the hearing, Jernigans reported that T.M. had a severe problem in every area of

basic reading skills and every area of reading comprehension.  He also reported severe problems in almost every area of written expression, mathematics calculation, mathematics reasoning, listening comprehension, oral expression, and inter- and intrapersonal behaviors, as well as every area of work habits and classroom behaviors.  Jernigans wrote that T.M.'s reading skills hindered or made it impossible for him to function at grade level, that he had difficulty writing coherently, using correct problem-solving strategies, working with others, and completing tasks, that he gave up easily, would not try to work independently, and acted impulsively and aggressively.  He wrote that T.M. needed "constant reminders to stay on task" and found "it hard to obey class and school rules."

An undated, second-grade  progress report signed by T.M.'s school principal was also submitted to the ALJ after the hearing.  T.M. received only 1s and 2s in the five core subjects, meaning he "sometimes" or "seldom" demonstrated expected performance.  The report states that T.M. "has difficulty staying on task and remaining focused to complete assignments. He can be disruptive at times.  He has difficulty maintaining self-control.  We need to work on his disruptive and sometimes offensive behavior."  A comment in the "reading" section states: "Staying focused on a task needs to improve."

***Medical Records Submitted to the ALJ***

The ALJ also considered records from St. Louis Pediatric Practitioners (SLPP).  T.M.'s father brought T.M. to a well-child visit with pediatrician Dr. Alison Nash of SLPP on September 27, 2006, when T.M. was four years old. A report submitted by Nash indicates that T.M. was in daycare at the time, had no abnormal physical findings, and had met age-appropriate milestones, including putting on a T-shirt, washing and drying his hands, using past tense, and brushing his teeth without help.

On August 28, 2007, T.M. visited pediatrician Dr. Homer Nash of SLPP for an "ADHD follow-up." T.M. was five years old at the time.  Nash noted that T.M.'s maternal uncle had a behavior disorder, and that T.M.'s school performance was "uncooperative."  T.M. was diagnosed with "conduct or behavioral disorder, unspecified" and referred to a psychologist.  On September 19, 2007, Turner called SLPP, seeking ADHD medication for T.M. and stating that she had been at school for two weeks observing his behavior.

On September 20, 2007, T.M. was diagnosed with attention deficit disorder with hyperactivity at SLPP.  Notes on the record state that there had been a recent phone call from school and that T.M. "still has some issues" but was doing better. Turner was working with Grace Hill to set up an appointment with a therapist.

T.M. began taking 10 milligrams of Adderall XR daily.

On October 25, 2007, T.M. visited SLPP for another ADHD follow-up.  The record from the visit states that T.M. was doing "a lot better" at school, that he was doing his homework daily, and that there had been "no calls that work has not been turned in."

Records from November 20, 2007, state that T.M.'s symptoms had recurred and he was having difficulty reading and interacting appropriately with others. His Adderall XR prescription was increased to 15 milligrams.

On January 17, 2008, SLPP records state that T.M. was "back to old behavior," believed his teacher was stealing from him when she checked his backpack, and that he was failing to finish his work.  Turner requested a dosage increase, and T.M.'s Adderall XR dosage was increased to 20 milligrams per day.

On May 7, 2008, T.M. had another ADHD follow-up visit at SLPP. Pediatrician Dr. Alison Nash determined that T.M.'s dosage of Adderall was appropriate and "stressed the importance of counseling to help [Turner] and [T.M.] learn how to manage his aggressive behavior."  The record indicates that since T.M. started taking 20 milligrams of Adderall, he had progressed better in school but "still has episodes of inappropriate, aggressive behavior." Turner had not yet

made an appointment at Grace Hill.  Turner reported that T.M.'s behavior was not a problem at home and that he got along with his siblings.

Turner brought T.M. to a well-child visit at SLPP on June 12, 2008, when T.M. was six years old.  The record from the visit notes that T.M. was "very active."  He was referred to a speech therapist of his choice for speech problems. A report from pediatrician Alison Nash, dated July 24, 2008, states that T.M.'s medication "has helped [him] function appropriately for [his] age."

On August 22, 2008, psychologist Dr. Vivian Knipp from Grace Hill Neighborhood Health Centers referred T.M. to the Office of Special Education with a diagnosis of ADHD and a reason of "outside services – psychoeducational evaluation."  Knipp wrote, "Child with positive response to medication but ongoing problems in school setting.  Please evaluate for underlying comorbid learning problems and need for support services in the classroom to address residual symptoms."  Turner's request for an IEP evaluation for T.M. had been denied by his school counselor and school psychologist four days prior to Knipp's referral.

On September 16, 2008, T.M. underwent a Speech and Language Evaluation at City Speech, Inc.  Examiner Lori Linder wrote that T.M. was able to spell his first and last names and give his age, birth date, address, and phone

– 15 –

number.  His speech was "fully intelligible."  Though he was in first grade, he

stated that he was in kindergarten.  T.M. received the following scores on the

*Clinical Evaluation of Language Fundamentals--Fourth Edition*: 56 in Core

Language, 63 in Receptive Language, 61 in Expressive Language, and 62 in

Language Structure.  All four scores are in the "very low/severe" range.  T.M.'s

affect was flat and he did not engage easily in conversation.  He gave minimal

information and had difficulty answering questions logically.  For example, when

asked why people wear helmets when riding bikes, T.M. responded, "Cause it not

raining."  T.M. had difficulty following oral directions, using adequate word

forms, recalling spoken information, formulating grammatically correct sentences,

understanding a variety of sentence forms, and initiating conversation.  Linder

found that T.M.'s language disorder would hinder full participation in school.

Records from T.M.'s Grace Hill case manager, Stacie Bryant, were also

submitted to the ALJ.  T.M. missed an appointment with his therapist at Grace Hill

on January 23, 2009.  An undated record from Bryant states that she, as well as

T.M.'s mother, father, teacher, school counselor, and school psychological

examiner, attended a third School Intervention Team meeting on T.M.'s behalf.

The attendees discussed math and behavior interventions that T.M.'s teacher had

begun in the classroom.  Recently, T.M. had not behaved well in school.  Bryant

"suggested [Turner] watch [T.M.'s] behavior prior to attributing the change in his behavior to medication, especially since she has not noticed any changes in [T.M.'s] behavior at home."  Bryant noted that no more team meetings were scheduled as "[T.M.'s] parent and school officials felt he was able to be successful in the classroom with planned interventions."

### ***Standard of Review***

When the Appeals Council denies a claimant's request for review, the ALJ's findings become the final decision of the Commissioner of the Social Security Administration.  *Gowell v. Apfel*, 242 F.3d 793, 795 (8th Cir. 2001).  The court's role on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole.  *Rucker v. Apfel*, 141 F.3d 1256, 1259 (8th Cir. 1998).  Substantial evidence is less than a preponderance but enough that a reasonable mind would find the evidence adequate to support the ALJ's conclusion.  *Collins ex rel. Williams v. Barnhart*, 335 F.3d 726, 729 (8th Cir. 2003).  As long as there is substantial evidence to support the Commissioner's decision, a court may not reverse it because substantial evidence also exists in the record that would have supported a contrary outcome, *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002), or because the court would have weighed the evidence differently.  *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).  In

determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000) (quoting *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999)).

### ***Standard for Determining Child Disability***

Under 42 U.S.C. § 1382c(3)(C)(i), a child is "disabled for purposes of [SSI] if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations" that have lasted or can be expected to last for at least twelve months or result in death.  In making this determination, the ALJ applies a sequential, multi-step test:

> 1. Is the child engaged in substantial gainful activity?
> 2. If not, does the child have an impairment or combination of impairments that is severe?
> 3. If so, do those impairments meet or "medically equal" an impairment listed in the regulations?
> 4. If not, do the impairments "functionally equal" an impairment listed in the regulations?

*See* 20 C.F.R. § 416.924(a); 20 C.F.R. pt. 404, subpt. P, app. 1, pt. B;

*Walker v. Apfel*, 141 F.3d 852, 854 (8th Cir. 1998).

The inquiry only proceeds to step four – the "functional equivalence" step – if the ALJ finds that (1) the child is not engaged in substantial gainful activity; (2)

the child has an impairment or combination of impairments that is severe; and (3)

that those impairments do not meet or "medically equal" an impairment listed in

the Social Security regulations.[3]  Once the ALJ reaches the "functional

equivalence" step, the ALJ considers how the child's impairment (or combination

of impairments) has affected his or her abilities within six broad domains of

functioning.  Together, these domains are "intended to capture all of what a child

can or cannot do."  20 C.F.R. § 416.926a(b)(1).  The six domains are:

1. Acquiring and Using Information;
2. Attending and Completing Tasks;
3. Interacting and Relating with Others;
4. Moving About and Manipulating Objects;
5. Caring for Yourself; and
6. Health and Physical Well-Being.

*Id.*

A child's impairments will be found to "functionally equal" the impairments

listed in the regulations if they cause the child to have "marked" limitations in at

least two of the domains or an "extreme" limitation in at least one domain.  20

C.F.R. § 416.926a(d).  A child has a "marked" limitation in one of these domains

---

[3]  T.M. has appealed only the ALJ's findings at the "functional equivalence" step.  For a more thorough description of the other steps in an ALJ's "sequential evaluation process," *see* 20 C.F.R. § 416.924(a)–(d); *Walker v. Apfel*, 141 F.3d 852, 854 (8th Cir. 1998).

when his or her "impairment(s) interferes seriously with his ability to

independently initiate, sustain, or complete activities."  20 C.F.R. §

416.926a(e)(2)(i); *see also Garrett ex rel. Moore v. Barnhart*, 366 F.3d 643, 651

(8th Cir. 2004) (quoting § 416.926a).  Likewise, a child has an "extreme"

limitation when his or her "impairment(s) interferes very seriously with his ability

to independently initiate, sustain, or complete activities."  20 C.F.R. §

416.926a(e)(3).  There may be "marked" or "extreme" limitations in only one

activity or in several activities as a result of the interactive and cumulative effects

of the child's impairments.  20 C.F.R. § 416.926a(e)(2)–(3).  To determine

whether the child is experiencing "marked" or "extreme" limitations in the

domains, the ALJ must review all the evidence in the record and compare the

child's functioning to "the typical functioning of children [the child's] age who do

not have impairments."  20 C.F.R. § 416.926a(f)(1).  *See also* 20 C.F.R. §

416.924a(b)(5)(ii); 20 C.F.R. § 416.926a(b).  The ALJ considers "the effects of

structured or supportive settings," how the child functions in school, and the

effects of the child's medications, if any.  20 C.F.R. § 416.926a(a)(1)–(3).  Finally,

in determining a child's disability, the Commissioner must consider all relevant

evidence, which may include medical evidence and information from people who

know the child – such as parents and teachers – and can provide evidence about

his functioning.  20 C.F.R. § 416.924a(a).

### *ALJ's Findings*

Although the ALJ found that T.M. had not engaged in substantial gainful activity and had severe impairments[4], he found that T.M. was not disabled within the meaning of the Social Security Act from June 12, 2008 (the date the application was filed), through the date of the decision.  The ALJ based this decision on his finding that T.M.'s impairments did not meet, medically equal, or functionally equal the impairments listed in the regulations.  In determining whether T.M.'s impairments functionally equaled the listings, the ALJ found that T.M. had no limitations in four of the domains[5] and "less than marked" limitations in the domains of (1) Attending and Completing Tasks and (2) Interacting and Relating with Others.

T.M. appeals the ALJ's findings in the domains of (1) Attending and Completing Tasks and (2) Interacting and Relating with Others.  T.M. essentially argues that the ALJ's findings that T.M. did not have "marked" limitations in these

---

[4]  The ALJ found that T.M. had severe impairments of ADHD (attention deficit hyperactivity disorder), conduct disorder, and expressive and receptive language disorder.

[5]  Those four domains are Acquiring and Using Information, Moving About and Manipulating Objects, Caring for Yourself, and Health and Physical Well-Being.  T.M. does not dispute the ALJ's finding that T.M. has no limitation in those domains.

two domains were not supported by substantial evidence.  I find that the ALJ's

determination of a less-than-marked limitation in the domain of Interacting and

Relating with Others was supported by substantial evidence.  Because the record

contains no evidence that T.M. has an "extreme" limitation in the domain of

Attending and Completing Tasks, the ALJ's determination as to Interacting and

Relating with Others is dispositive, and I affirm on that basis.

### *Attending and Completing Tasks*

"When considering the attending and completing tasks domain, the inquiry

focuses on how well the child is able to focus and maintain his or her attention and

how well the child begins, carries through, and finishes activities."  *England v.*

*Astrue*, 490 F.3d 1017, 1022 (8th Cir. 2007) (citing 20 C.F.R. § 416.926a(h)).  A

school-age child should be able to focus his attention in a variety of situations, to

concentrate on details, to change activities or routines without distracting himself

or others, to stay on task, and to complete a transition task without extra reminders

and accommodation.  20 C.F.R. § 416.926a(h)(2)(iv) (A school-age child should

also be able to follow directions, remember and organize school materials,

complete assignments, and sustain attention well enough to participate in group

sports, read independently, and complete family chores).  *See also*  Social Security

Ruling 09–4p, *Title XVI: Determining Childhood Disability – The Functional*

– 22 –

*Equivalence Domain of "Attending and Completing Tasks*," 2009 WL 396033 (Feb. 18, 2009) (The inquiry also includes consideration of the child's alertness and ability to focus on an activity or task despite distractions, to perform tasks at an appropriate pace, to change focus after completing a task, and to avoid impulsive thinking and acting).

After considering the regulations and SSR 09–4p, the ALJ concluded that:

> The claimant has less than marked limitation in attending and completing tasks.  The claimant has been diagnosed with ADHD and treated with medications.  The medical records in file indicate that with increased dosages of his Adderall he showed favorable response as had improved on-task behaviors.  The claimant's medications have recently been changed and as it seems that this medication is not showing the desired results, further medication changes may be forthcoming.  With the correct medication and dosage thereof, the claimant can, as he has in the past, demonstrate on-task behavior, and overall he has less than marked limitations in this domain.

It is proper for an ALJ to consider whether a claimant's impairments can be treated with medication when determining whether a claimant has an impairment in a functional equivalence domain.  *See* 20 C.F.R. § 416.926a(a)(3); 20 C.F.R. § 416.924a(b)(9)(i)(D)–(E) (stating that the Commissioner will consider "changes in [a child's] medication or the way [the child's] medication is prescribed; and [a]ny evidence over time of how medication helps or does not help [the child] to function compared to other children your age who do not have impairments");

– 23 –

*Collins ex rel. Williams v. Barnhart*, 335 F.3d 726, 729–730 (8th Cir. 2003

("[I]mpairments that are controllable by medication do not support a finding of

total disability."); *Blake ex rel. Blake v. Barnhart*, 28 Fed. Appx. 597, 599 (8th

Cir. 2002) (finding that denial of benefits is supported when a child's

hyperactivity can be controlled through properly administered medication).

But the most recent medical evidence in the record about T.M.'s response to

increased dosages of Adderall was Dr. Allison Nash's evaluation, which was dated

July 24, 2008, nearly sixteen months before the hearing took place.  During the

November 2009 hearing, Turner testified:

> Q: . . . . And so is he only taking this Vyvanse medicine
> recently?
>
> A: [The doctor] just switched [T.M.].  He was on Adderall.  He
> started off on Adderall at 10 milligrams.  The Adderall went all the
> way up to 30 milligrams recently, and for some reason, I'm not sure if
> he built up a tolerance for it, but for some reason it stopped working
> or he built up a tolerance for it, and more recently, within the last two
> months, he has been more physical with other children, he's been
> having more behavior issues in the classroom.  I have a hard time
> with him at home following directions.  That's why I requested that,
> you know, to the pediatrician, is there something else that, you know,
> we can give him because I don't think it's working anymore, so that's
> why [the pediatrician] put him on that.

Turner went on to testify that T.M. had "had more physical actions recently than

ever" and that she had stopped giving him the Adderall during the weekend before

the hearing because he had "been a little bit more violent."  Turner stated that the

Adderall had worked very well for T.M. "until recently."  She testified that:

> . . . . when he first was on it I noticed a difference.  I did notice a
> difference in his hyperactivity and his attention.  Last year he made a
> little bit of progress and he was still on the medicine, but every so
> often we would have to increase it because it was, of course, wearing
> off or starting not to work anymore for that dosage, but we would
> only go up maybe five milligrams.  So he got all the way up to 30
> milligrams in October and I just think that it just stopped working
> again.  So we tried the Vyvanse and that's definitely not – the
> Vyvanse is definitely not working for him.

It is undisputed in the record that T.M.'s ability to function in the Attending and

Completing Tasks domain had worsened considerably after Dr. Nash's medical

evaluation in July 2008.  In October and November 2009, T.M. had been removed

from an after-school tutoring program because of his behavior, suspended from the

bus because he hit and kicked other students, and written up multiple times by his

classroom teacher.  Turner testified that the second-grade teacher had to physically

restrain T.M. when the class would walk down the hall together.  According to an

evaluation completed by his second-grade teacher in November 2009, T.M. "gives

up easily, will not try to work independently, needs constant reminders to stay on

task," and "[f]inds it hard to obey class and school rules."  The teacher also wrote

that T.M. was not following directions, was easily distracted, and "finds it difficult

to return to completing tasks."  Turner testified that T.M.'s school had sent her

– 25 –

paperwork for an IEP shortly before the hearing, and T.M.'s December 2009

progress report showed that he only "sometimes" or "seldom" demonstrated

expected performance in the five core academic subjects, a notable deviation from

his first-quarter second-grade report card.  The progress report states that T.M.

"has difficulty staying on task and remaining focused to complete assignments."

There was, in fact, no substantial evidence that T.M.'s medication – either

Adderall or Vyvanse – was addressing his ability to attend and complete tasks at

or near the time of the hearing.

Of course, when adequately explained and supported, credibility

determinations are for the ALJ to make, *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir.

2000), and an ALJ is not required to credit assessments by teachers over

assessments by treating doctors.  *See England v. Astrue*, 490 F.3d 1017, 1022 (8th

Cir. 2007).  But an ALJ does have a duty to fully develop the record.  *Stormo v.*

*Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) ("Because the social security

disability hearing is non-adversarial, . . . the ALJ's duty to develop the record

exists independent of the claimant's burden in the case.").  If an ALJ fails to fairly

develop the record, the court may remand for the taking of additional evidence.

*Hildebrand v. Barnhart*, 302 F.3d 836, 838 (8th Cir. 2002).  "There is no bright

line test for determining when the [Commissioner] has . . . failed to develop the

record.  The determination in each case must be made on a case by case basis."

*Gregg v. Barnhart*, 354 F.3d 710, 712 (8th Cir. 2003) (internal quotation omitted)

(brackets and ellipses in original).

Here, it may be that the ALJ is correct in his prediction that, with the correct

medication and dosage, T.M. will again be able to demonstrate on-task behaviors,

but there was no substantial evidence in the record to support that finding at the

time of the hearing.  To the contrary, the most recent evidence – including

Turner's testimony and T.M.'s second-grade records – demonstrates that despite

four dosage increases and a complete change in medication, T.M. continued to be

unable to demonstrate on-task behaviors.  *See* 20 C.F.R. § 416.924a(2)(i)–(iii)

(stating that "parents and other caregivers can be important sources of information

because they usually see you every day"); *Mayo ex rel. D.L. v. Astrue*, 4:11-CV-

201 LMB, 2012 WL 996580 (E.D. Mo. March 22, 2012) (remanding, in part,

because the only medical evidence supporting the ALJ's finding that the claimant

had a less-than-marked limitation was over a year old and submitted by

consultative psychologists who did not have the benefit of the majority of the

records before them).  If the ALJ found that the evidence from Turner and T.M.'s

school was not credible, he should have ordered a consultative evaluation or, at

least, inquired as to why there was no recent medical evidence in the record.  As

the record stands, there was not substantial evidence to support his finding that T.M. had a less-than-marked limitation in the domain of Attending and Completing Tasks.

But despite the dearth of recent medical records about T.M.'s impairments in the domain of Attending and Completing Tasks – or perhaps because of it – there is also no evidence that T.M. has an "extreme" limitation in that domain. Though an extreme limitation does not necessarily mean a total lack or loss of ability to function, it is a limitation that interferes very seriously with a child's ability to independently initiate, sustain, or complete activities. *Scales v. Barnhart*, 363 F.3d 699, 703–04 (8th Cir. 2004) (internal quotations omitted) (citing 20 C.F.R. § 416.926a(e)(3)(i)).  It is a rating given to the "worst limitations."  20 C.F.R. § 416.926a(e)(3)(i).  Despite T.M.'s obvious problems completing his school assignments, working independently and without distracting others, and transitioning between school tasks, he remains in a regular classroom and, according to his second-grade progress report, completes homework assignments consistently.  His limitations are not among the "worst limitations."  In other words, the record provides no evidence that he has an "extreme" limitation in the domain of Attending and Completing Tasks.

### *Interacting and Relating with Others*

In the domain of Interacting and Relating with Others, the Commissioner
considers how well a child initiates and sustains emotional connections with
others, develops and uses the language of the child's community, cooperates with
others, and responds to criticism.  20 C.F.R. § 416.926a(i).  A school-age child
"should be able to develop more lasting friendships" with children his age; begin
to understand how to work in groups to create projects and solve problems; have
an increasing ability to understand another's point of view and to tolerate
differences; and be "well able to talk to people of all ages, to share ideas, tell
stories, and to speak in a manner that both familiar and unfamiliar listeners readily
understand."  20 C.F.R. § 416.926a(i)(2)(iv).

Turner indicated in an undated function report that T.M. had friends his own
age and that he generally got along with her, other adults, and his school teachers.
The November 2009 educational evaluation shows that for the bullet point item
"speech is difficult to understand," T.M.'s second-grade teacher marked that it was
"not a problem."  T.M.'s second-grade progress report from December 2009
shows that he consistently contributed positively to class discussion and followed
directions.  In addition, the ALJ noted that:

> the claimant has also been diagnosed with a severe expressive and

receptive language disorder and therapy has been recommended.  As
of the date of the hearing, this recommendation had not yet been
applied.  Failure to comply with recommended treatment is a
component considered when an individual is applying for disability
benefits (20 CFR 416.930).  In this case, the failure to seek the
recommended treatment goes against the claimant's credibility.  The
claimant has only recently begun treatment with a counselor for his
aggressive behaviors, and had only three sessions with the counselor.
With time and continued treatment, there is no reason to believe that
this treatment will not be beneficial in decreasing his behavioral
problems.

Because the ALJ is in the best position to determine the credibility of the

testimony, he is granted deference in that regard.  *Johnson v. Apfel*, 240 F.3d 1145,

1147 (8th Cir. 2001) (citing *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984)).

The ALJ's finding that T.M. had a less-than-marked limitation in the domain of

Interacting and Relating with Others is supported by substantial evidence,

including Turner's failure to follow up on the speech-therapy recommendation and

the second grade teacher's report that T.M. contributed positively to class

discussion.  *See Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997) ("[F]ailure

to follow a prescribed course of remedial treatment without good cause is grounds

for denying an application for benefits."); *Hudson ex rel. Jones v. Barnhart*, 345

F.3d 661, 668 (8th Cir. 2003) (finding that evidence that a child was a "class

clown," able to communicate with others, had not engaged in dangerous

behaviors, and whose depression had improved with medication supported a

finding of a less-than-marked limitation in the domain of Interacting and Relating with Others).

### *Conclusion*

The ALJ did not err in his finding that T.M. had a less-than-marked limitation in the domain of Interacting and Relating with Others.  His error as to the domain of Attending and Completing Tasks is therefore rendered harmless because the evidence described above demonstrates that T.M. does not have an "extreme" limitation in that domain.  *See Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995) (holding that "reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial"); *Muhammad ex rel. T.I.M. v. Commissioner of Social Sec.*, 395 Fed. Appx. 593, 601–02 (11th Cir. 2010) (finding that even if substantial evidence did not support the ALJ's determination that the claimant had less-than-marked limitations in one domain, that error was harmless because the evidence showed that the claimant did not have marked or extreme limitations in any other domains).  Therefore, I will affirm the ALJ's finding that T.M. was not disabled within the meaning of the Social Security Act between the dates of June 12, 2008 and January 8, 2010.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 17th day of September, 2012